UNITED STATES DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DIANE E. GATEWOOD,**

**Plaintiff,**

-vs-                                                  **Case No. 6:09-cv-122-Orl-31KRS**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

**Defendant.**
_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Diane E. Gatewood, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 10, 11.

**I.    PROCEDURAL  HISTORY.**

On March 27, 2006, Gatewood applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act). R. 80-82.[1] She alleged

_____

[1] The SSI application and related documents are not in the record.

that she became disabled on January 10, 2003.  R. 80.  Gatewood's applications were denied initially and on reconsideration. R. 33-38, 46-47, 49-53.

Gatewood requested a hearing before an administrative law judge (ALJ).  R. 45.  An ALJ held a hearing on May 19, 2008.  R. 568-603. Gatewood, who was represented by a non-attorney representative, testified at the hearing.   R. 570-93.  Walter Todorowski, a vocational expert (VE), also testified.  R. 66-67, 593-602.

After considering the testimony and the medical evidence presented, the ALJ determined that Gatewood had not engaged in substantial gainful activity since January 10, 2003, the alleged onset date of her disability.  The ALJ found that she was insured under OASDI through December 31, 2007.[2]  R. 18.

The ALJ concluded that the medical evidence showed that Gatewood had the following severe combination of impairments: (1) coronary artery disease; (2) obesity; and (3) diabetes neuropathy.  R. 18.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[3]  R. 18.  The ALJ found that Gatewood did not have any severe mental impairments based on lack of mental health treatment and a consultative examination showing no memory problems.  *Id.* The ALJ did not attach a Psychiatric Review Technique Form to the decision or otherwise

---

[2]  The ALJ appears to have made a typographical error as she indicated Gatewood met the requirements of the Act "on" December 31, 2007.  R. 18.

[3]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

evaluate Gatewood's mental functional capacity in the areas of daily living, social functioning, concentration, persistence and pace, and episodes of decompensation.

The ALJ found that Gatewood had the residual functional capacity (RFC) to perform sedentary work[4] but with additional restrictions of no repetitive bending, no lifting greater than 15 pounds at one time and 10 pounds on a regular basis, no loading of weight on the head or neck, and no repetitive bending of the head and neck.  R. 25.  In reaching this conclusion, the ALJ found Gatewood's testimony about the limitations arising from her impairments was not credible prior to February 25, 2008.  R. 26.

The ALJ found that Gatewood was unable to perform her past relevant work.  R. 27. The ALJ found under the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, that Gatewood was disabled as of February 25, 2008, when she turned 50 years old.  R. 29.  The ALJ relied on the testimony of the VE to conclude that Gatewood could perform work available in the national economy before February 25, 2008, specifically food and beverage order clerk and call out operator, both of which are sedentary positions. R.  29.  Therefore, the ALJ concluded that Gatewood was not disabled prior to February 25, 2008.  R. 28-29.

Gatewood requested review of the ALJ's decision.  R. 11.  On November 13, 2008, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 5-7. Gatewood timely sought review of this decision by this Court.  Doc. No. 1.

---

[4] Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. § 404.1567; 20 C.F.R. § 416.967.

## II.  JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.  STATEMENT OF FACTS.

*A.  Gatewood's Testimony and Written Statements.*

Gatewood was born in 1958.  R. 572.  She is 5'7" tall.  R. 250.  At the time of the hearing, she weighed 265 pounds.  R. 581.  She completed high school.  R. 573.

From 1993 to 1995, she worked at an elementary school as a prep aide for first grade. She had also been a route sales representative for Frito-Lay from 1995 to 2002.  R. 573. In 2002 and 2003, she worked as a sales clerk for a convenience store.  In 2002 and 2003, she also worked receiving merchandise at Target.  She had not worked since January 10, 2003.  R. 579.

Gatewood testified that she had a bulging discs in her neck and in all sections of her back.  She was unable to use her arms "a lot" in front of her because it caused pain and spasms.  Neck injuries caused headaches, and she could not hold her head back or "come forward" without becoming dizzy.  She had gained 68 pounds, which made it difficult to walk long distances. R. 581.

She had a heart attack in November of 2003 which required open heart surgery.  For her heart, she continued to have a stress test every six months and took medication.  R. 584. She also had high blood pressure, was diabetic, and her feet would swell.  R. 581-82.

She lived with a roommate and a grandchild. She had taken care of the 8-year old grandchild since 2006, and was the child's legal guardian. R. 582.

On a typical day, Gatewood cooked, made sure the child ate and got to school, dressed herself, mopped, vacuumed, swept, and was able to take care of her personal hygiene. After 15 minutes of sweeping, she had to stop because the movement of her arms hurt her back, pain radiated down her legs and she would have to sit down for 20 minutes. R. 582-85. She had a chair in the shower. R. 583. She could not blow dry her hair, so she had a stand which held her blow dryer. She was unable to do crafts because she had difficulty moving her arms and sitting. R. 584. She had a driver's license, was able to drive, and drove herself to the hearing. R. 572-73.

In an uncomfortable chair, she could sit for 15 minutes and then her legs would go to sleep. If the chair was cushioned, she could sit for 30 minutes, and in a recliner she could sit a little longer. R. 585. She could only stand and wash dishes for 10 minutes. R. 585-86. She could stand in line in the grocery store for 20 minutes if she leaned on the buggy. R. 586. She could walk one block but then would have difficulty breathing and her legs and feet would hurt. R. 586. If she used her arms doing activities such as sweeping, her back would catch, and she would have to lie down for 30 minutes. R. 586-87. She was able to ride a motorcycle with a friend for 30 minutes. R. 590. She had to lie down approximately 6 times per day. She could lift 10 pounds but any lifting caused pain. R. 587.

She was in pain all the time. R. 587-88. She took Oxycodone for the pain but it did not help. She did not think pain medications were effective, but just made her "loopy." R. 588.

She had memory problems.   She could not remember past occurrences when asked to recall them, and she had difficulty remembering dates.  R. 581, 588-89.  She used a calendar to remember appointments.  She had difficulty concentrating and would forget what she was doing.  She could not read a book.  R. 589-90.

She was taking Wellbutrin for depression.  R. 590.  She was not seeing a psychiatrist or psychologist.  R. 592.

She had difficulty sleeping and has been diagnosed with sleep apnea.  She was given a machine to use but she was still tired the next day when she used it.  She would fall asleep during the day, even while she was talking with someone.  R. 591.

*B.*    *Vocational Expert Testimony.*

Walter Todorowski, the VE, testified at the hearing before the ALJ.  R. 593-603.  The ALJ asked the VE to assume the following hypothetical individual:

> [A]n individual who is between the ages of 44 and 50, who has the education and past relevant work as described for the claimant. . . . [T]he individual is to do no repetitive bending, could lift 15 pounds at one time and ten pounds on a regular basis, should do no loading of weight on the head or neck, and no
>
> repetitive bending of the hearing or neck.

R. 594, 596  The VE opined that this individual could not perform Gatewood's past relevant work.  R. 596-97.  He indicated, however, that the individual could perform the jobs of food and beverage order clerk and call out operator, both of which are sedentary, unskilled jobs available in the national economy.  R. 597-98.  The VE indicated that Gatewood could perform these jobs even if she had difficulty holding her hands out in front of her.  R. 599-600.

*C.    Medical Records.*

Gatewood was injured in a car accident on January 10, 2003. R. 404.  Testing at Florida Hospital on that date revealed no acute bony abnormality in the left elbow to account for her complaints of joint pain.  R. 201.  Mild degenerative changes were present in the cervical spine.  R. 202.  Degenerative spondylitic pathology was seen in the lumbosacral spine with calcific arteriosclerosis.  R. 204.

On January 17, 2003, Gatewood sought treatment from Gustav A. Marquardt, D.C. R. 404-07. An MRI of the lumbar spine on February 18, 2003, revealed bulging discs at T12-L1 and L2-3, more severe at L2-3, and neural encroachment at L2-3.  R. 413-413A.  An MRI of the cervical spine on the same date revealed bulging discs at C4-5, C5-6, and C6-7 and neural encroachment on the right at C6-7.  R. 414-15.  An MRI of the thoracic spine on March 22, 2003 revealed bulging discs at T3-4, T4-5 and T8-9; disc bulge and disc herniation at T5-6 resulting in ventral cord compression; disc bulges and disc herniations at T6-7 and T7-8, with approximation of the right lateral spinal cord; disc herniation at T9-10; and neural encroachment at T4-5, T8-9, and T9-10.  R. 410-12.  Dr. Marquardt wrote on January 22, 2003, that Gatewood was unable to work.  R. 403.  He indicated on March 7, 2003, that although Gatewood's condition was improving slowly, she still could not return to work because she could not stand for long periods.  R. 400.

On May 29, 2003, Edwin M. Villalobos, M.D., performed electrodiagnostic testing which revealed no acute cervical or lumbosacral radiculopathy or neuropathy and mild right carpal tunnel syndrome with borderline findings noted on the left.  R. 205-08.

On August 5, 2003, Dr. Marquardt issued a final report of his treatment of Gatewood. R. 386-94. He noted that Gatewood had not returned to work since the car accident. R. 387. Gatewood continued to complain of pain exacerbated by household activities or exercise. She also had tingling and numbness in fingers on both hands, shoulder and lower back pain, and pain and stiffness in her neck. *Id.* She still had limitations in range of motion in the spine with tenderness on palpation. R. 390-91. He concluded that Gatewood had reached maximum medical improvement with a permanent impairment of the whole person of 31%. R. 391, 394.

On September 15, 2003, Peter J. Godleski, M.D., an orthopaedic surgeon, examined Gatewood. R. 274-75. Gatewood complained of headaches, neck pain radiating to the right and left shoulder, numbness in the right and left fingers once every two weeks, thoracic pain, and back pain radiating to the right and left buttocks, thigh and foot, with numbness in her feet. The neck and back pain were constant, varied with activity, and were aggravated with sitting, bending, standing, walking, lifting, and driving. R. 274.

Upon examination, Dr. Godleski noted tenderness to palpation along her spine and in her trapezius and parascapular muscles with pain on range of motion. He also observed pain in overhead motion of the left shoulder with some limited range of motion. Gatewood had decreased sensation in parts of her right hand, right foot and left big toe. Dr. Godleski's impression was cervical sprain or strain with radiculopathy, thoracic sprain or strain, and lumbosacral sprain or strain with radiculopathy. Dr. Godleski recommended she continue with conservative treatment, including anti-inflammatory and analgesic medications. He also prescribed Celebrex. R. 275.

Dr. Godleski later reviewed reports of radiologic examinations. He found that Gatewood had disc bulging in the cervical, thoracic and lumbosacral spine and disc herniation in the thoracic spine. He opined that Gatewood reached maximum medical improvement on September 16, 2003 from injuries sustained in the car accident, with a permanent partial impairment of function of 7%. R. 270. He indicated that Gatewood would be restricted to no repetitive bending, no lifting greater than 15 pounds at one time and 10 pounds on a regular basis, no loading of weight on the head or neck, and no repetitive bending of the head and neck. R. 270-71.

On November 4, 2003, Gatewood had a heart attack and later underwent triple cardiac bypass surgery. R. 209-30. The records reflect diagnoses of hypertension, coronary artery disease, and obesity. R. 210, 212, 216. She continued to suffer from hypertension and coronary artery disease following the surgery. *See, e.g.,* R. 243.

Darlene M. Go, M.D., of Florida Cardiology, P.A., treated Gatewood following her surgery. R. 249-57. On December 10, 2003, Gatewood felt "pretty good." R. 254. Dr. Go recommended that Gatewood increase her ambulation. *Id.* As of April 28, 2004, Gatewood reported leg pain if she stood up too long and exertional fatigue. A note dated May 10, 2004, reflects that Dr. Go did not impose any restriction on Gatewood's exertion, but advised her to monitor her blood pressure. R. 251. On August 18, 2004, Gatewood reported occasional pain in her chest with arm movement and that she became tired a lot. Dr. Go recommended weight loss. R. 250.

Susan Toth, M.D., began treating Gatewood for diabetes on July 7, 2004. R. 322. As of November 4, 2004, Gatewood felt much better and was not having any glycemic episodes.

R. 318.   Her diabetes and hyperlipidemia were well controlled as of May 3, 2005.   Dr. Toth recommended diet, exercise, and weight loss.   R. 313, 317.

Robert T. Hoover, II, D.P.M., evaluated Gatewood on November 29, 2004.   His impression was diabetic neuropathy.   He recommended exercise and vitamin B6.   R. 473.

On December 15, 2004, Raaj Popli, M.D., at Digestive Disease Consultants evaluated Gatewood.   R. 258-61.   Gatewood complained of abdominal and epigastric discomfort and a long history of heartburn and dyspepsia.   R. 258.   She had recently gained 30 pounds.   R. 258-59.   Dr. Popli's assessment was enlarged pancreatic head which needed further evaluation, nonalcoholic fatty liver disease, and gastroesophageal reflux disease (GERD) occurring more than twice a week.   R. 260.

Gatewood returned to Dr. Godelski on September 15, 2005.   She complained of radiating neck and back pain and numbness in fingers of her left hand.   Her neck and back pain was aggravated by sitting, bending, standing, walking, lifting and driving.   Upon examination, Dr. Godelski noted tenderness to palpation and pain on range of motion in the spine, and decreased sensation in the left arm and hand and lower paracervical muscles. His assessment was cervical, thoracic and lumbosacral sprain or strain and cervical and lumbar radiculopathy.   R. 267.   He recommended conservative treatment with medication and use of heat or ice.   R. 268.

Gatewood treated with Puxiao Cen, M.D., a cardiologist, on April 20, 2005, for chest pain and shortness of breath.   Dr. Cen recommended weight loss and ordered several tests.  R. 369-71.   Following testing, his impression was ischemic heart disease.   R. 365.

On April 28, 2005, Gatewood complained of foot pain in her arch. Dr. Hoover injected a tendon and recommended rest and massage of the foot with ice/coolant spray. His notes reflect that Gatewood's diabetic peripheral neuropathy was uncontrolled. R. 475.

Stephen R. Goll, M.D., evaluated Gatewood on July 20, 2005. She complained of neck and back pain following her car accident in 2003. R. 284-96. The pain was exacerbated by almost all daily activities, radiated into her shoulders and into both legs from the buttocks, and she had numbness and tingling in her right and left hands. R. 284-85. Upon examination, Dr. Goll noted pain on palpation and range of motion in various areas of Gatewood's spine with some diminished sensation at C7. A straight leg raising test was positive for pain in the right lower extremities. After review of medical records and x-rays, Dr. Goll's impression was chronic cervical strain, cervical degenerative disc disease at C4-5, C5-6 and C6-7, and chronic lumbar strain. R. 295. He did not recommend surgery or any additional orthopaedic treatment. R. 295-96. Work restrictions were assigned as sedentary work, no lifting more than 10 pounds, no prolonged standing or sitting for more than 15-20 minutes at a time without the opportunity to get up, move around, or change position. There was no indication for any additional pain management. R. 296.

On July 25, 2005, Paul S. Webster, M.D., at Doctors' Pain Management Associates examined Gatewood. R. 297-98. The treatment note indicates this was a follow-up appointment but no prior records were included. Gatewood complained of increasing pain in the neck, mid-back, lower back, arms, and left leg. She was also experiencing crying spells. Epidural steroid injections increased her pain. She had decreased her physical activities and described herself as depressed. R. 297. Upon examination, Dr. Webster

noted decreased range of motion in her thoraco-lumbar spine with pain, tenderness on palpation in the lumbar spine, and a straight leg raising test was positive for pain. She walked normally but had an antalgic posture. Dr. Webster's assessment was post-traumatic cervical, thoracic, and lumbar sprain/strain, cervical disc bulge-multiple, lumbar disc bulge-multiple, herniated thoracic disc, and myofascial pain syndrome. He gave her a prescription for Oxycontin and recommended psychological counseling. R. 298.

On August 22, 2005, Gatewood told Dr. Webster that her pain had worsened and was an 8 out of 10 when taking medication and 10 out of 10 when not taking medication. Regarding her depression, she indicated she was feeling much better, although she could not afford psychological counseling. R. 446. Dr. Webster prescribed Oxycontin. R. 447. On September 19, 2005, Gatewood continued to complain of back and neck pain and numbness and tingling in her fingers. Gatewood indicated that her 5-year old grandchild lived with her and kept her busy. Dr. Webster observed pain on range of motion in Gatewood's spine. R. 448-49. On December 20, 2005, she complained of the same pain as previously and, additionally, left wrist pain. R. 450.

Gatewood continued to treat with Dr. Webster for her pain, and he continued her on Oxycontin in March, 2006. R. 453. He noted she had full range of motion albeit painful. R. 453. At a follow up visit with Dr. Cen on May 9, 2006, he changed her medications, recommended a low carbohydrate diet, aerobic exercise, and weight loss. R. 354-57.

On June 1, 2006, Gatewood returned to Dr. Webster. She rated her pain as 5 out of 10 with medication. Dr. Webster prescribed Lyrica in additional to Gatewood's other medication. R. 454. On July 31, 2006, her wrist was better but her back pain had increased.

She was doing some swimming. Dr. Webster prescribed Oxycontin and Flexeril. R. 456-57. She reported on September 7, 2006, that Flexeril made her sleepy. On this visit, only her lumbar spine was tender to palpation. A straight leg raising test was positive for pain. Her left wrist was also tender to palpation. R. 458-59.

Sam Ranganathan, M.D., evaluated Gatewood on August 2, 2006, at the request of the SSA. R. 338-41. She complained of constant low back pain radiating to her left leg most of the time, and sometimes to both legs. She told him her blood sugar and high blood pressure were under control. She reported that she cooked and hand-washed dishes, drove, made her bed, did laundry, vacuumed, and mopped. However, when she did things fast, she had heart palpations. R. 338. Dr. Ranganathan observed that Gatewood was able to walk, get on and off the examination table, take off her shoes, and walk down the hall. Upon examination, he observed mild tenderness in the lumbar and cervical area, with low back discomfort during a straight-leg raising test, and some decreased range of motion in the spine. She also had decreased light touch sensation in the right leg, foot and forearm. R. 339-41. Dr. Ranganathan diagnosed cervical and lumbar spine sprain and degenerative joint disease (DJD) of the cervical and lumbar spine, obesity, hypertension, and diabetes. R. 339.

On October 12, 2006, Gatewood complained of depression symptoms to Dr. Toth. Dr. Toth observed that Gatewood had a flat affect and was tearful. She prescribed Wellbutrin. R. 471.

On December 5, 2006, Nancy S. Hinkeldey, Ph.D., a psychologist, examined Gatewood at the request of the SSA. R. 416-19. Dr. Hinkeldey observed that Gatewood's affect was flat and she was occasionally tearful. Gatewood's thought processes were logical

and coherent and her cognitive status appeared intact, although Gatewood admitted to suicidal ideation. She showed adequate orientation and her attention and concentration during the examination appeared to be normal. No memory difficulty was apparent. R. 418. She indicated that Gatewood's depression would likely be adequately treated, though some chronic low level symptoms may remain. Social functioning appeared marginal. Dr. Hinkeldey opined that Gatewood's social skills might be mildly affected by her depression, "though not to a significant degree." R. 416-17. Gatewood needed continuing treatment for depression and improvement was likely. She was diagnosed with a dysthymic disorder. *Id.*

On December 15, 2006, Gatewood indicated to Dr. Toth that "she fe[lt] good today." R. 470.

She treated with Dr. Webster on February 6, 2007, and described increased low back pain with numbness and tingling. Medication was only minimally helpful in reducing the pain. R. 460.

Gatewood began treating with Alexander C. Jungreis, M.D., at the National Pain Institute on April 23, 2007. She complained of pain in the neck, low- and mid-back and legs, and some weakness in her arms with numbness and tingling in her fingers. She also reported some forgetfulness, depression and anxiety due to pain. R. 516. Upon examination, Dr. Jungreis noted reduced range of motion in her cervical spine, tenderness in her left shoulder and thoracic spine, and decreased range of motion and moderate-to-severe tenderness in her lumbar spine. R. 517. An MRI showed degenerative changes in the lumbar spine with facet degeneration, and lumbar facet injections were scheduled. R. 515. Dr. Jungries's assessment was lumbar spondylosis, sacroiliitis, paraspinal muscle

spasms, and cervical facet mediated pain. R. 518. Taking the medication hydrocodone at night helped her pain. *Id.* In May of 2007, Dr. Jungries gave her samples of Cymbalta to help her depressive symptoms and her chronic pain syndrome. R. 514.

On June 5, 2007, Dr. Jungries again examined Gatewood. She reported that lumbar facet injection were administered, which helped relieve her pain, although she had some increase in pain after gardening. Dr. Jungries observed that Gatewood had full range of motion with some tenderness throughout her spine and shoulders. R. 510. By July 23, 2007, Gatewood reported that hydrocodone was not working for her pain. R. 496.

On July 30, 2007, Dr. Toth took Gatewood off Wellbutrin, but about a month later, Gatewood seemed to have melancholy views and was tired despite sleeping. R. 466-67. Dr. Toth recommended a sleep study. R. 466.

As of August 20, 2007, Gatewood described her pain to Dr. Jungreis as 1 on a 10-point scale. R. 492. Her pain improved 75% as a result of lumbar facet injections, but she tripped on a wood deck and her pain flared up again. R. 491, 495. On September 17, 2007, her pain was still at a level of 1 out of 10, and she complained of dragging her feet, but did not have any focal weakness in her lower extremities. R. 491. Her pain level remained at 1 out of 10 until October 2007, when it increased to 5 out of 10. R. 480, 484.

Gatewood continued to receive facet injections through at least November 1, 2007. R. 479. Thereafter, she fell twice injuring her right knee and left leg. R. 562. Her pain was not responding as well to medication, and Dr. Jungreis changed her pain medication. R. 561-62, 565. She continued to treat with Dr. Jungreis through April 25, 2008. R. 544-56.

Meanwhile, on December 20, 2007, Amr Morsi, M.D., at Florida Heart Group, noted that Gatewood had increasing symptoms of leg edema and weight gain with shortness of breath with heavy exertion only. R. 534. Dr. Morsi's impressions were mixed hyperlipidemia, hypertensive heart disease, and coronary atherosclerosis. He recommended weight loss, aerobic exercise and ordered further tests. R. 536. On January 8, 2008, Gatewood underwent an adenosine 2-day stress test. R. 531. She had a cardiac catheterization on January 15, 2008, after which she felt well. R. 519.

C.    Reviewing Professionals.

A Physical Residual Functional Capacity Assessment[5] indicated that Gatewood could occasionally lift 50 pounds, could frequently lift and/or carry 25 pounds, could stand and/or walk and sit about 6 hours in an 8-hour workday, and could perform unlimited pushing and pulling. R. 277. Gatewood was restricted to occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. R. 278. She should avoid concentrated exposure to extreme cold, wetness, and hazards. R. 280. The reviewer noted that the severity of Gatewood's symptoms was only partially credible based on intact neurology and good range of motion. R. 281.

On August 11, 2006, Glenn Bigsby, D.O., completed a Physical Residual Functional Capacity Assessment. R. 342- 49. He indicated that Gatewood was capable of occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking and sitting about 6 hours in an 8-hour workday, performing unlimited pushing and/or

_____

[5] The last page of the assessment is missing, which would indicate the date and the name of the physician performing the assessment. The table of contents indicates this assessment was completed on March 30, 2005. R. 2 at 9F.

pulling, and occasionally climbing ladders, ropes and scaffolds, stooping, and crouching. R. 343-44. He indicated: "Symptoms credible and established by MRI evidence . . . ." R. 347.

Violet Acero Stone, M.D., completed a Physical Residual Functional Capacity Assessment on January 4, 2007. R. 420-27. According to Dr. Stone, Gatewood could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk and sit about 6 hours in an 8-hour workday, perform unlimited pushing and pulling, frequently climb, balance, kneel, and crawl, and occasionally stoop and crouch. R. 421-22. She should avoid concentrated exposure to extreme heat, extreme cold and hazards. R. 424. Dr. Stone noted Gatewood's "pain symptoms [we]re partially credible in that she does have established back disc degeneration." R. 425.

A Psychiatric Review Technique completed by Eric Wiener, Ph.D., on January 4, 2007, indicated that Gatewood had a nonsevere dysthymic disorder. R. 428, 431. He opined that this disorder would result in mild limitations on activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. R. 438. He noted that her "functional limitations due to her mental impairment are minimal." R. 440.

## IV. STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment.  *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied

in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Servs*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V. ANALYSIS.

Gatewood asserts four grounds supporting reversal. First, she asserts that the ALJ failed to consider her depression, back condition, hypertension and diabetes in combination with her other conditions at step two of the sequential evaluation process. Second, she argues that the ALJ failed to give proper weight to the restrictions recommended by Dr. Goll in his evaluation. Third, she alleges that the ALJ improperly relied on the testimony of the VE because the hypothetical presented did not include restrictions assigned by Drs. Goll and Hinkeldey. Fourth, she asserts that the ALJ did not provide adequate reasons for questioning her credibility. These are the only issues I will address.[6]

---

[6] The parties were advised that issues not specifically raised would be waived. Doc. No. 11.

*A.    Combination and Severity of Impairments.*

Gatewood argues that because the ALJ did not find her depression, back condition, hypertension, and diabetes to be severe impairments at step two of the evaluation process, the ALJ did not consider all of her impairments in combination.

At step two of the five-step evaluation process, the ALJ is called upon to determine whether a claimant's impairments are severe. By definition, this inquiry is a "threshold" inquiry. It allows only claims based on the most trivial impairments to be rejected. In this circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. A claimant need show only that his impairment is not so slight and its effect not so minimal. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). However, failure to find an impairment severe at step two can be harmless error if the ALJ considers the functional limitations of the impairment at later steps of the evaluation. *See, e.g., Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

The ALJ found that Gatewood had severe impairments of coronary artery disease, obesity, and diabetes neuropathy.  R. 18.  The finding regarding diabetic neuropathy is sufficient to show that the ALJ found that Gatewood's diabetes and related symptoms were considered and found to be severe.

While the ALJ did not specifically address Gatewood's back impairment at step two, she considered the functional limitations arising from that impairment in detail in her opinion. She concluded that Gatewood would have functional limitations arising from that impairment.

Therefore, the failure to find Gatewood's back impairment to be severe at step two was harmless error.

The ALJ also considered Gatewood's depression, but found it not to be a severe impairment. In making this finding, however, the ALJ did not complete a psychiatric review technique form (PRTF) or otherwise complete the analysis of Gatewood's limitation in four functional areas. The Eleventh Circuit has found as follows:

> Agency regulations require the ALJ to use the "special technique" dictated by the PRTF for evaluating mental impairments. 20 C.F.R. § 404.1520a-(a). This technique requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a-(c)(3-4). The ALJ is required to incorporate the results of this technique into the findings and conclusions. 20 C.F.R. § 404.1520a-(e)(2). . . . "[W]here a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF and append it to the decision or incorporate its mode of analysis into his findings and conclusion. Failure to do so requires remand.

*Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005) (per curiam).

The record shows at least a colorable claim of mental impairment based on Dr. Hinkeldey's assessment that Gatewood suffered from a dysthymic disorder, and treatment for depression by Dr. Toth and Dr. Jungries. Furthermore, the lack of treatment by a psychologist or psychiatrist is explained by Gatewood's testimony that she did not have funds for such treatment. *Cf. Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988)(holding that poverty excuses noncompliance with treatment). Under these circumstances, the ALJ was required either to complete a PRTF or otherwise evaluate Gatewood's limitations in the four functional areas. Sometimes this is done by adopting the

mental RFC assessment of a reviewing physician. In this case, however, while the ALJ referred to the reviewing psychologist's RFC assessment, she did not adopt it. *See* R. 27. Accordingly, the ALJ erred in the evaluation of Gatewood's mental impairment.

       *B.     Dr. Goll's restrictions.*

Gatewood asserts that the ALJ failed to give proper weight to the functional limitations outlined by Dr. Goll. Dr. Goll's restrictions were more stringent than those assigned by Dr. Godleski in that he indicated that Gatewood could not do any prolonged standing or sitting for more than 15-20 minutes at a time without the opportunity to get up, move around, or change position. R. 296.

"In assessing the medical evidence in this case, the ALJ was required to state with particularity the weight [s]he gave the different medical opinions and the reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam) (citation omitted). Although the ALJ mentioned Dr. Goll's restrictions, the ALJ did not state the weight she gave to Dr. Goll's opinion or any reason why she did not utilize Dr. Goll's more stringent restrictions. While the Commissioner suggests in his brief that the ALJ could have opted for the opinion of Dr. Godleski over that of Dr. Goll because a treating physician's opinion can be given more weight, the ALJ failed to address the issue at all.

As I read the law in this circuit, the review by this Court must focus on the reasons the ALJ gave for not giving weight to the opinion of a physician, not an after-the-fact justification presented by the Commissioner. Accordingly, the ALJ was obligated to state the weight she accorded Dr. Goll's opinion and the reasons for not crediting his opinion. Absent this

information from the ALJ, the record is insufficient to permit meaningful review.  *See Owens v. Heckler*, 748 F.2d 1511, 1514-15 (11th Cir. 1984) (per curiam).

C.      *Hypothetical Question to the VE.*

"In order for a vocational expert's testimony to constitute substantial evidence the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).  Gatewood asserts that the hypothetical presented to the VE improperly excluded restrictions assigned by Drs. Goll and Hinkeldey.

As discussed earlier, the failure to complete the special technique for evaluating the functional limitations arising from Gatewood's mental impairment and the failure to state the weight given to the opinion of Dr. Goll leaves the Court with insufficient information to determine whether the hypothetical questions posed to the VE incorporated all of Gatewood's functional limitations. Therefore, remand for further proceedings is also required on this assignment of error.

D.      *Credibility.*

Finally, Gatewood submits that the ALJ did not follow the pain standard in this circuit in evaluating her complaints of the limitations arising from pain and other subjective symptoms. Gatewood does not outline in this part of her argument which of her complaints of pain and other subjective symptoms were not adequately addressed by the ALJ.  Because remand is required due to other deficiencies discussed herein, it is sufficient to outline the relevant standard that must be applied on remand.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical

> condition is of such a severity that it can be reasonably expected to give rise
> to the alleged pain.

*Foote*, 67 F.3d at 1560-61. When an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones*, 941 F.2d at 1532 (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

> D. *Remand for Further Proceedings or An Award of Benefits.*

Gatewood asks that the Court remand the case and direct the Commissioner to award her benefits. She asks, alternatively, that the Court remand the case for further proceedings. The Court may order an award of benefits only "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Because the Commissioner has not properly evaluated Gatewood's mental impairment and has not stated the weight given to the RFC assessment of Dr. Goll, it is not clear that disability has been established without any doubt. Accordingly, remand for further proceedings is required.

## VI. RECOMMENDATION.

For the reasons stated herein, I respectfully recommend that the decision of the Commissioner be **REVERSED** and that this case be **REMANDED** for the Commissioner of the Social Security Administration for further proceedings. I further recommend that the Court direct the Clerk of Court to enter judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 11, 2010.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy